1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF OREGON

3          THE HON. JOLIE RUSSO, JUDGE PRESIDING

4

5

6   UNITED STATES OF AMERICA,          )
                                       )
7                    Government,       )
                                       )
8          v.                          ) No. 6:16-mj-00056-JR-1
                                       )
9   MICHAEL RAY EMRY,                  )
                                       )
10                   Defendant.        )
    _____)

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                  EUGENE, OREGON

15              TUESDAY, MAY 24, 2016

16                  PAGES 1 - 22

17

18

19

20

21                      Kristi L. Anderson
                        Official Federal Reporter
22                      United States Courthouse
                        405 East Eighth Avenue
23                      Eugene, Oregon 97401
                        (541) 431-4112
24                      Kristi_Anderson@ord.uscourts.gov

25

1   APPEARANCES OF COUNSEL:

2

3   FOR THE GOVERNMENT:

4   Nathan J. Lichvarcik
    United States Attorney's Office
5   405 E. Eighth Avenue
    Suite 2400
6   Eugene, OR 97401
    541-465-6771
7   Email: nathan.j.lichvarcik@usdoj.gov

8

9   FOR THE DEFENDANT:

10  Marc Spence
    Spence & Sabitt LLP
11  747 Willamette St
    Eugene, OR 97401
12  541-343-9909
    Fax: 541-343-0014
13  Email: mm2attys@aol.com

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        PROCEEDINGS

 2                   TUESDAY, MAY 24, 2016

 3            THE COURT:  Thank you.  Please be seated.

 4            THE CLERK:  Now is the time set for Criminal

 5    Case -- I'm sorry -- Magistrate Case 16-56, United States of

 6    America versus Michael Ray Emry for detention hearing.

 7            THE COURT:  Thank you.  Mr. Emry, the purpose of

 8    this hearing is to determine whether the court should

 9    release you from custody pretrial.

10            I have had the opportunity to review the seven

11    letters or declarations from various individuals, one from

12    Southern Oregon; three from Idaho; two from Grant County,

13    Oregon; and one from New Jersey submitted by your lawyers,

14    Mr. Sabitt and Mr. Spence.

15            Thank you very much for doing that.  I appreciate

16    that.

17            MR. SPENCE:  Thank you, Your Honor.

18            THE COURT:  I have consulted, actually, twice with

19    the pretrial services officer assigned to your case.  I will

20    note that she has worked tirelessly since May 9th, spending

21    literally hours interviewing a large number of individuals

22    as well as tracking down relevant information for the

23    court's examination, including recorded phone messages that

24    she has received.

25            I wanted to ask Ms. Brown, have you had an
```

1    opportunity to talk with ATF Agent Smith yet?

2              MS. BROWN:  No, Your Honor.

3              THE COURT:  Okay.  Thank you.

4              I also consulted with Judge Coffin, utilizing his

5    30 years of judicial experience.

6              The pretrial services officer is recommending

7    detention on the grounds that defendant is a danger to the

8    community.

9              I am interested, government counsel, do you concur

10   with this recommendation?

11             MR. LICHVARCIK:  I do, Judge.  And frankly, I was

12   prepared to, in a long-winded kind of way, walk through some

13   of the detention factors for Your Honor, if you'd like me to

14   do that at this point or if you'd prefer that I wait until

15   another point in the hearing.

16             THE COURT:  Why don't you -- you are talking about

17   18 U.S.C. 3142(e)?

18             MR. LICHVARCIK:  (g).

19             THE COURT:  (g).  Excuse me.

20             Please, for the record.  Thank you.

21             MR. LICHVARCIK:  And the reason I am doing this,

22   Judge, is because this is somewhat of a unique case.  I

23   mean, I guess -- you know, at first blush and I guess the

24   simple way to look at this case would be to say, well, it's

25   just a -- it's a gun case on a man who really has no

1    criminal convictions that are noteworthy.  And if you were

2    to look at the case in that way, it would be easy to say,

3    well, why shouldn't he be released.

4            And the reason I wanted to walk through some of

5    the factors for Your Honor is because once you start to peel

6    away layers of this case, and, really, as you apply the

7    facts as we know them to the 3142(g) detention factors, you

8    start to realize this isn't just a simple, run-of-the-mill

9    case.  And when you really apply the facts to the factors, I

10   think all of the factors point towards detention.  I don't

11   think they all point as strongly as each other towards

12   detention, but I still think they all point in the same

13   direction.

14           And so that's going to be the structure of my

15   argument is just walking the court through those (g) factors

16   with a big-picture argument that we have a very, very

17   serious weapon capable of very serious consequences.  We

18   also have a detonator for a bomb found with this .50 caliber

19   machine gun, and we have it on a guy who has a history with

20   a lot of machine guns and a bomb.  And then we have some

21   serious witness safety concerns.

22           So generally, that's the structure of my argument,

23   and, you know, with the indulgence of the court, again, I am

24   going to be a little longer winded than I normally am, and I

25   might not be this long-winded again for another year or so,

1    but there are some aspects of this case that I think need to

2    be explained a little more.

3            THE COURT:  Go ahead.

4            MR. LICHVARCIK:  So starting with nature and

5    circumstance of the offense, it's a .50 caliber machine gun.

6    And I think in the context of guns, the .50 caliber machine

7    gun is the -- to me, it's the silverback gorilla of the gun

8    world.  And to even call it a gun I think is not doing

9    service to it.  It's, frankly, a -- it's a weapon of war.

10   There is a reason that it's been used by the U.S. military

11   mounted on vehicle and aircraft during wars, and that's

12   because it's a weapon designed and capable of taking down

13   small aircraft, disabling vehicles.

14           I have prosecuted just -- .50 caliber cases down

15   on the border involved in cartel trafficking, and so I know

16   I have had ATF experts testify that the .50 caliber, not

17   even in the machine gun form, that it's capable of killing a

18   person from over a mile away, taking out the engine block of

19   a vehicle, shooting through a brick wall.

20           So I think when you look at what kind of gun we

21   are talking about, this isn't just a run-of-the-mill person

22   with a .22 caliber gun and they are not supposed to have it.

23   This is a firearm, well, by defendant's own admission, that

24   could fire five to six hundred rounds per minute, and we are

25   talking about some pretty serious rounds of ammunition.

1       Not only is it one of the more serious types of
2  guns that can be possessed, there is some aggravating
3  factors around his possession of it that I think increase
4  the seriousness of the offense.
5       Number one, by his own admission, he stole it from
6  a gun dealer over in Idaho.  And I can't say for sure that
7  that's the truth.  You know, I know that he admitted that
8  and I know that the gun dealer in Idaho said the same thing.
9       I am not sure I completely believe that but, at
10  least by his own admission, he stole it from this Idaho gun
11  dealer.
12       He brought it over to our state in Oregon.  And by
13  his own admission, he obliterated the serial number once it
14  was brought over here, thus creating what he described in a
15  recorded call as an untraceable, fully functioning .50 cal
16  machine gun.
17       And we also know that he was trying to sell it in
18  the Oregon marketplace.  And that's, frankly, the reason we
19  needed to move so quickly and get the execute -- get the
20  search warrant executed is because I had and the agents had
21  a very real concern and we had information that he had a
22  ready and willing buyer for it.  And so we needed to move
23  quickly because if a fully functioning .50 cal machine gun
24  with a ground-off serial number did make its way into the
25  illicit firearms world, I mean, I don't want to get into

1    hyperbole, but if it got into -- you can imagine a number of

2    circumstances where it got in the hands of someone who

3    shouldn't have it and who had bad intentions.  And that's

4    the reason we moved so quickly.

5            In addition, we were told by the cooperating

6    witness in this case -- and the cooperating witness has a

7    load of baggage with him too.  We set that out in the search

8    warrant affidavit.  But that doesn't mean that I -- or we

9    can ignore what he told us because he also told us that

10   Mr. Emry had a machine gun, a .50 cal machine gun, and he

11   was right about that.

12           The three, I guess, most concerning things that we

13   learned from this cooperating witness, Judge, was, number

14   one, that Mr. Emry wanted to take the .50 caliber machine

15   gun onto the Malheur Refuge during the occupation but that

16   he couldn't because of the law enforcement presence.

17           Emry stated that he had a large arsenal of weapons

18   and access to grenades, and Mr. Emry spoke about shooting

19   police officers and how a bullet from the .50 cal would

20   penetrate the side of a police car and a Kevlar vest.

21   Again, I don't have any information apart from the

22   cooperating witness having told us that, but I can't ignore

23   it, especially in light of the other things we heard from

24   the cooperating witness ended up being true.

25           And sure enough, when we searched Mr. Emry's

1    trailer and the vehicles, we found the .50 cal machine gun

2    we heard about and were looking for, and we also found a

3    blasting cap, which is basically a detonator for a bomb.

4          And we also found the parts, and I don't think it

5    was all the parts, but we found some parts that, if he was

6    able to get the other parts, could create another machine

7    gun called a Sterling machine gun.  That's on the nature and

8    circumstances of the offense.

9          And I think and I'd be -- well, I would be

10   surprised, I guess, if the defendant was somehow able to

11   argue that the offense was not dangerous.

12         I do know that during a confession, Mr. Emry

13   talked about that the gun might have something wrong with it

14   and that it might blow up if people tried to fire it.  And I

15   don't know yet if that's true.  But what I do know is that

16   when we were using an undercover officer to talk about the

17   gun, that never came up.  It was purported by Mr. Emry

18   during the undercover phone call to be a fully functioning

19   .50 caliber machine gun.

20         Weight of the evidence, which I know Your Honor

21   knows is the least important but that doesn't mean we ignore

22   it either, the weight of the evidence is strong.  We have a

23   recorded conversation of Mr. Emry stating that the machine

24   gun is fully automatic and untraceable.  We seized the

25   machine gun from his trailer.  And in subsequent interviews,

1    Mr. Emry confessed, I believe, not once, not twice, I think

2    a total of three times, and he confessed in detail.

3              We have also been in the process of listening to

4    his jail calls, which are voluminous, and I can't say that

5    we have listened to even a large percentage of them.  But

6    he's made statements about having brought the gun over here

7    and having been the one to grind off the serial number in

8    those jail calls.

9              So strength of the evidence is there.  Again, that

10   factor, although a weaker factor to consider, that also

11   points in the same direction as the seriousness of the

12   offense.

13             And I will just kind of put a little asterisks on

14   that because I know the court sometimes wants to know, well,

15   is this a probationary case, is this a case involving jail

16   time, if there's a -- you know, if the weight of the

17   evidence is strong, his guideline calculations, while there

18   might be some disputes over them, I can -- I think that I

19   can say at this point that his guideline calculations are,

20   at a minimum, four plus years and that we will be seeking

21   prison time on Mr. Emry.

22             So if all we knew -- and I am going to move on to

23   history and characteristics unless the court has any

24   questions on what I have covered so far.

25             THE COURT:  Go ahead.

1          MR. LICHVARCIK:  Moving on to history and

2     characteristics, if all I knew about Mr. Emry is what I have

3     said so far about him, I would be asking for detention.  And

4     I would also be saying, then, in that scenario that it might

5     be a closer call.

6          But there's more to Mr. Emry than just what I have

7     said.  Who is he?  You know, I think we are still trying to

8     figure that out.  And if you were to read the affidavits

9     that have been submitted by the defense, he sounds like he's

10    the salt of the earth.  And I am not saying he's a horrible

11    guy or intrinsically bad or anything like that.

12         But what I do know is he has a bit of a darker

13    side and a bit of a dark -- and while he might not have

14    criminal convictions related to guns and bombs on his

15    criminal history sheet, what he does have, though -- well,

16    he's been described as the Picasso of machine guns.  He was

17    caught having made, I think, and he admitted in his

18    testimony back in 2004, that he made approximately maybe

19    more than 66 machine guns for an individual in that

20    individual's bunker of firearms.

21         And he also was caught having made a bomb for an

22    individual who wanted to use that bomb to kill somebody.

23    Now, whether Mr. Emry knew or not exactly what this person

24    wanted to do with the bomb I believe is up for debate.  Now,

25    I am not saying -- I don't know yet exactly what he knew.

1          But what I have done is I have reviewed his

2    testimony, and I have provided it both to the defense and to

3    pretrial, and, by his own testimony, he made a bomb out of

4    C-4 and a detonator.  And he testified, I believe, that the

5    bomb was capable of blowing up an area I think three times

6    the size of the federal courtroom that he was testifying in.

7    And he acknowledged that the bomb could do a lot of harm and

8    was highly illegal.

9          So we have a man who also testified that he had

10   made a silencer and that the machine guns he had made for

11   the individual with the bunker, at one point Mr. Emry was

12   worried that he was going to go on a rampage, as he

13   testified.

14         So we have a man that might not have criminal

15   history convictions, but we still have a man who has been

16   caught now with a very dangerous machine gun and a detonator

17   for a bomb and the parts for another machine gun, who has a

18   history with bombs, silencers, and machine guns.

19         And, again, this is -- you know, what kind of

20   individual is caught with those things a while ago and then

21   goes ahead and continues to engage in that conduct?

22         And, Judge, my position is that's an individual

23   who says loudly and clearly that they can't be trusted to

24   abide by any court-ordered conditions of supervision.

25         Is Mr. Emry going to go do anything bad?  Is he

going to go -- I don't know.  I can't say for absolute

certainty.  I don't think the court can say what he's going

to do with absolute certainty.  I don't think the feds can

say.  We don't have any kind of crystal ball that's going to

tell us.  And I think the detention factors recognize that,

and that's why they have us walk through the various factors

to see which direction they point in.

So in terms of danger to a person or community if

released, again, I don't want to overstate this because it's

so hard to predict with the future.  All I can do is flag

what I have flagged to the defense and pretrial services

about what our concerns are.

And, again, Mr. Emry's past, which I think is the

best predictor of his future behavior, is riddled with

dangerousness:  Bombs, machine guns.

The cooperating witness in this case is very

scared.  Since Emry's arrest, Emry has been talking to a lot

of people on the phone about who he believes the

confidential witness is, and he's gone so far as to say, "He

ain't going to escape this one."  And I will repeat that

because I listened to that portion of the call and I just

provided it.  I know the defense hasn't listened to that

yet.  I just got it, and I am trying to give them

information as it's coming in.

But I listened to that, and there was no context

1    around that.  There was no -- that I heard.  There was no

2    mitigating kind of explanation.  He said, "The CW ain't

3    going to escape this one."

4            That's concerning.  You know, I have tried to

5    construe that in a number of different ways favorable to

6    Mr. Emry.  I can't really think of a way that that can

7    honestly be construed that doesn't at least cause concern

8    for this confidential witness in this case.

9            And sure enough, it should come as no surprise

10   that the confidential witnesses in fact received a number of

11   phone calls since Mr. Emry was arrested.  A number of them

12   were just hangups, but at least one of them said something

13   to the effect of, we know where you are.

14           And the confidential witness believes that Emry's

15   conduct since being arrested is putting his or her life in

16   danger.

17           So, again, looking at the totality of the

18   circumstances, knowing that we can't predict exactly what

19   Mr. Emry is going to do, and knowing that Mr. Emry is not --

20   I am not saying he's the worst person in the world or he's

21   inherently bad or inherently dangerous.  But when you walk

22   through in a calculated way and stack the evidence up to the

23   detention factors, we look at the dangerousness of the

24   offense, we look at his history with machine guns, bombs,

25   silencers, and we look at the witness safety concern.  And I

1    think that anything short of detention in this case is just

2    a roll of the dice that some people are not deserving of.

3              THE COURT:  Thank you very much.

4              Mr. Spence.

5              MR. SPENCE:  Thank you, Your Honor.  Marc Spence

6    with or on behalf, for today, of Mr. Sabitt on behalf of

7    Mr. Emry.

8              So from our perspective, there is a lot of noise

9    and collateral distractions about this case that have to do

10   with unfortunate developments in this state over the last

11   several months that ought to not be part of this case,

12   frankly, and that seem to bring into focus things that don't

13   belong in this case.  I mean, from our perspective, boiling

14   this detention or release question down to its fundamental

15   facts are these:

16             That Mr. Emry is 54 years old.  The court is well

17   familiar with criminality rates and recidivism rates and

18   likely to engage in reckless conduct as highly tied to age.

19   And here is someone who is 54 years old who sits before the

20   court today.

21             Secondly, in terms of criminal history, he has a

22   *de minimis* record.  It looks like there is some sort of

23   check offense from 1992.  That seems to be the only thing

24   that's out there.

25             And reliability, he's never had an FTA.

1          So the three things that we think are the most

2     important and relevant factors for the court to consider

3     here today are 54 years old, *de minimis*, almost nonexistent

4     involvement in the system, criminal justice system, as a

5     defendant, and never had an FTA.

6          He's got good community support here today.  Just

7     to support him, I guess sort of a sampling, are his partner,

8     slash, spouse Becky Hudson; Vicky Davis is a stronger

9     supporter who came all the way from Twin Falls, Idaho; two

10    other women who came from long distances to provide support.

11         And my understanding -- well, I will get to the

12    tape or the recordings in a second.

13         Let me just talk about Mr. Emry's number one goal

14    for being not in detention or not detained is that his

15    number one goal is to have the opportunity to help out his

16    wife to get settled, to make arrangements, recognizing that

17    he does have a fair amount of exposure in this case.  And so

18    it's just a common, understandable human desire to want to

19    be able to take care of and settle into a long-term living

20    situation the person that he cares about.  That's his

21    primary goal.

22         And that obviously ties in with one of the

23    questions, which is is he a flight risk.  He's absolutely

24    not a flight risk.

25         In terms of the arguments having to do with the

1    confidential source in this case, we just ask the court to

2    completely discount that and ask -- and rely instead on the

3    objective facts here.  The confidential source has -- it is

4    no secret is not a reliable -- has been unreliable in the

5    past, can't be relied on, and appears to be engaged in sort

6    of self-serving hyperbole with respect to this case.  He is

7    not making -- he or she is not making a secret of their own

8    identity, not making a secret of their own involvement in a

9    shared community, and so -- and, in fact, continues to

10   insert themselves into conversations that have to do with

11   shared populations of acquaintances.  So not acting in any

12   way like somebody who is fearful and not acting in any way

13   like somebody who doesn't want to be noticed but, in fact,

14   continues to be sort of actively engaging in conversation

15   and communication with shared acquaintances.

16          In terms of the -- what has now been provided to

17   us today, a CD, my understanding is that it is -- and again,

18   we just received it, so I am just relying on fragments of

19   information, but my understanding is that it's taped calls

20   from the jail that Mr. Emry clearly knew he was being taped;

21   that these conversations primarily are with some women that

22   he is acquainted with through his reporting endeavors and

23   his political endeavors.  These are 50- and 60-year-old

24   women, one of whom I know from my partner was a 25-year

25   employee of the federal government; not a population that's

1   likely to be engaging in unlawful retribution-type behavior.

2         My understanding of the conversation was they

3   could easily be viewed in the context of the person that is

4   identified as the informant who is out and openly engaging

5   in interactions with other members of the community, from

6   that population's perspective, faces legal or political

7   consequences that this language can easily be interpreted

8   that way versus the worst-case interpretation that appears

9   to be at least suggested to the court at this point.

10         With respect to the weapon, certainly there are

11   concerning circumstances around the weapon.  Again, it's

12   noted there was no ammunition.  Again, it's -- that there is

13   some question about whether it's even functional.  And

14   really, from our perspective, if you take away kind of the

15   environment or the collateral excitement of what has

16   happened in Oregon over the last several months, this case

17   could easily be viewed as a simple theft case of a valuable,

18   collectible weapon that has a high level of marketplace

19   value unrelated to the violent circumstances that have been

20   considered also at that time.

21         We understand that there continue to be a number

22   of unknowns.  We certainly appreciate the work that

23   Ms. Brown has put into this.  But I understand there are

24   other things -- other people, including Agent Smith, that

25   she -- that ultimately could be contacted or connected with.

1    And just today there is new information that has come to us

2    in terms of the CD with what I understand is a partial list

3    of the conversations that were recorded at the jail.

4            So our perspective is that the objective facts

5    support release, and at this point I would say that there

6    are really no conditions that he would not agree to.  And

7    certainly you could fashion a set of conditions, a set of

8    circumstances and rules that would govern behavior that

9    would lead to his safe release into the community.  And that

10    would include, obviously, no weapons; obviously, no contact,

11    third-party contact with the person who is alleged to be the

12    informant; certainly, given the kind of complicated number

13    of relationships that are out there, no contact with any

14    number of people; and, in fact, house arrest he

15    would certainly -- would agree would be reasonable.

16            So there are certainly a set of circumstances that

17    could be fashioned by the court that could ensure the safety

18    of the community, get him home to his spouse, and allow him

19    to make plans with her for the future, acknowledging the

20    seriousness of the offense and the possibility of a

21    significant consequence.

22            In the alternative, if that's not where the court

23    is willing to go today, we would ask that any ruling be

24    without prejudice so that Mr. Sabitt could revisit it in the

25    near future.

1              THE COURT:  Thank you very much, Mr. Spence.  I

2      appreciate your argument and time.

3              Mr. Lichvarcik, anything further that you'd like

4      to add?

5              MR. LICHVARCIK:  No, Your Honor.

6              THE COURT:  Okay.  I have thought a great deal

7      about this case as well as looked very carefully at

8      § 3142(g).

9              As I mentioned, I consulted with Judge Coffin.  I

10     have consulted with Ms. Brown, who I know consulted with her

11     supervisor.  There have been a lot of people looking at this

12     and thinking about this.  I really -- Ms. Brown, in terms of

13     the information, she certainly has compiled a tremendous

14     amount of information that she has presented to me to assist

15     with my decision here today, and I do appreciate that.

16              I realize that pretrial detention is serious, and

17     I certainly don't make this decision lightly.  Based on the

18     statutory grounds outlined in 18 U.S.C. § 3142(g), including

19     as outlined by the government, the nature and circumstance

20     of the charged offense, which is illegally possessing a .50

21     caliber machine gun with an obliterated serial number; the

22     weight of the evidence, I actually had the opportunity to

23     review several pages of transcribed recorded phone calls

24     that Mr. Emry placed from the jail, weight the evidence;

25     history and characteristics of the defendant; and finally,

1   the nature and seriousness of the danger to any person or

2   the community if Mr. Emry is released.

3           I will therefore enter an order continuing

4   defendant's pretrial detention on the ground that there are

5   no conditions that will reasonably assure the safety of the

6   community due to the factors discussed on the record and the

7   factors set forth in the pretrial services report.

8           And I make that ruling without prejudice,

9   Mr. Spence, as you requested.

10          MR. SPENCE:  Thank you, Your Honor.

11          THE COURT:  Anything further today?

12          MR. LICHVARCIK:  Not from the government.

13          MR. SPENCE:  No, Your Honor.  Thank you.

14          THE COURT:  Thank you.

15          THE CLERK:  This court's adjourned.

16          *(The proceedings were concluded this*

17          *24th day of May, 2016.)*

18

19

20

21

22

23

24

25

1          I hereby certify that the foregoing is a true and

2     correct transcript of the oral proceedings had in the

3     above-entitled matter, to the best of my skill and ability,

4     dated this 26th day of May, 2016.

5

6     /s/Kristi L. Anderson
      _____
7     Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25